THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARVIN DYKES and MARK HARRIS, | CASE NO. C17-1549-JCC |
| Plaintiffs, | ORDER |
| v. | |
| BNSF RAILWAY COMPANY, | |
| Defendant/Third-Party Plaintiff, | |
| CANADIAN NATIONAL RAILWAY COMPANY, | |
| Third-Party Defendant. | |

This matter comes before the Court on Third-Party Defendant Canadian National Railway Company's ("CNR") motion to dismiss for lack of personal jurisdiction (Dkt. No. 43). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby GRANTS the motion for the reasons explained herein.

I. **BACKGROUND**

In May 2017, Plaintiffs were working as the conductor and locomotive engineer aboard a BNSF Railway Company ("BNSF") train when it derailed in British Columbia, Canada. (Dkt. No. 47-1 at 3, 14.) Plaintiffs had boarded the train the night before in Everett, Washington and

were headed for the Thornton Railyard ("Thornton Yard") located near Surrey, British Columbia. (*Id.* at 3, 11.) Thornton Yard is owned by third-party Defendant CNR. (Dkt. No. 47-3 at 8.) CNR is a Canadian corporation with its principal place of business in Montreal, Quebec, Canada. (Dkt. No. 44 at 2.) BNSF is a U.S. corporation, incorporated in Delaware, with its principal place of business in Texas. (Dkt. No. 39 at 2.)

In 2000, BNSF and CNR entered into an Interchange Agreement with Running Rights ("Interchange Agreement") that allows BNSF to use sections of CNR's tracks at and around Thornton Yard in order to interchange loaded and empty freight cars. (*See* Dkt. No. 50-2.) Specifically, the Interchange Agreement grants BNSF the right to operate its trains on CNR's railways at Thornton Yard, as well as on the tracks leading into and out of the railyard (a segment known as the "Brownsville lead"). (*Id.* at 1–2; Dkt. No. 47-2 at 34.) The Interchange Agreement only pertains to this segment of CNR's railways in British Columbia. (*See generally* Dkt. No. 50-2) ("[CNR] has agreed to provide BNSF with the right to operate trains over a portion of [CNR's] railway lines from Brownsville, B.C. to Surrey, B.C.") The Interchange Agreement also contains an indemnification provision that makes BNSF and CNR liable to one another if either railroad is exclusively at fault for a collision or derailment occurring on the tracks that are covered by the agreement. (*Id.* at 8.) The Interchange Agreement is to be governed and interpreted in accordance with the laws of British Columbia and Canada. (*Id.* at 11.)

The BNSF train that Plaintiffs were working on was en route to Thornton Yard when it derailed after hitting a broken rail on the Brownsville lead. (Dkt. Nos. 47-1 at 25, 52-2 at 5, 47-2 at 34–35.) Plaintiffs allege that they suffered severe injuries as a result of the derailment. (Dkt. No. 47-3 at 24.) Plaintiffs filed this lawsuit in King County Superior Court against BNSF for negligence under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51.[1] (Dkt. No. 1-2.) BNSF subsequently filed a third-party complaint against CNR for indemnity and contribution

---

[1] BNSF removed the lawsuit to this Court. (Dkt. No. 1.) Additionally, Plaintiffs originally filed separate lawsuits that the Court consolidated into this action. (Dkt. No. 9.)

pursuant to the Interchange Agreement's indemnification provision. (Dkt. No. 39.) Plaintiffs have not made any claims against CNR, nor has CNR made cross-claims against Plaintiffs. CNR moves to dismiss BNSF's third-party complaint for lack of personal jurisdiction. (Dkt. No. 43.)

## II. DISCUSSION

### A. Legal Standard

When a defendant moves to dismiss a case pursuant to Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of demonstrating that personal jurisdiction exists.[2] *See Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990). In resolving a Rule 12(b)(2) motion, the Court may consider affidavits, declarations, and other evidence outside of the pleadings. *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001). Where, as here, CNR's motion is supported only by written materials, such as the pleadings and affidavits, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015).

Where no applicable federal statute governs personal jurisdiction, a district court looks to the forum state's "long-arm" statute. *See* Fed. R. Civ. P. 4(k)(1)(A); *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002). Washington's long-arm statute permits the exercise of jurisdiction to the full extent of the Constitution's Due Process Clause. *See* Wash. Rev. Code § 4.28.185; *Shute v. Carnival Cruise Lines*, 783 P.2d 78, 79–80 (Wash. 1989), rev'd on other grounds by, *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585 (1991). Constitutional due process requires that a defendant have at least "minimum contacts" with the relevant forum such that a court's exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Depending on a defendant's contacts with the forum state, it may be subject to

---

[2] Given that CNR was brought into this lawsuit as a third-party defendant, it is BNSF's burden, as third-party plaintiff, to demonstrate that the Court possesses personal jurisdiction. *See Birzer v. Jockey's Guild, Inc.*, 444 F. Supp. 2d 1005, 1008 (C.D. Cal. 2006).

either general or specific personal jurisdiction. *Easter v. Am. W. Fin.*, 381 F.3d 948, 960 (9th Cir. 2004).

Since neither party asserts that general jurisdiction applies here, the Court need only decide whether it can exercise specific jurisdiction over CNR.[3] The Ninth Circuit employs a three-part test to determine whether a defendant has sufficient contacts with a forum state to be subject to personal jurisdiction:

> (1) The non-resident defendant must purposefully direct [its] activities or consummate some transaction with the forum or resident thereof; or perform some act by which [it] purposefully avails [itself] of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (citation omitted). The plaintiff has the burden of proving the first two prongs. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011). If the plaintiff succeeds, the burden shifts to the defendant to "set forth a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

### B. CNR's Motion to Dismiss

BNSF asserts that the Court has specific jurisdiction over CNR because:

(1) CN[R] has a business relationship with BNSF that requires BNSF to use its Washington employees and equipment to transport goods from Washington up to CN[R] in Canada and back to Washington; (2) this litigation arises out of that Washington-based business relationship, as the derailment occurred while BNSF

---

[3] General jurisdiction exists when a defendant's contacts with the forum state are so "continuous and systematic" as to render the defendant essentially "at home" in that forum. *See Daimler AG v. Bauman*, 571 U.S. 117, 134 (2014). The record conclusively demonstrates that CNR does not have systematic and continuous contacts with Washington, such that it could be subject to general jurisdiction.

was using its Washington employees to transport goods from Washington to CN[R] in Canada; and (3) the exercise of personal jurisdiction over CN[R] is reasonable and consistent with due process under the U.S. Constitution.

(Dkt. No. 48 at 2.) As explained below, the Court lacks specific jurisdiction because CNR does not avail itself of the benefits of doing business in Washington, and the third-party claims at issue in this litigation do not arise out of CNR's contacts with Washington.

        1.     Purposeful Availment

The Ninth Circuit has made clear that, "[a] purposeful availment analysis is most often used in suits sounding in contract . . . [while a] purposeful direction analysis, on the other hand, is most often used in suits sounding in tort." *Schwarzenegger*, 374 F.3d at 802; *see also Ziegler v. Indian River Cty.*, 64 F.3d 470, 473 (9th Cir. 1995) (noting that "we apply different purposeful availment tests to contract and tort cases"). BNSF's third-party claims against CNR sound in contract.[4] (*See* Dkt. No. 39 at 4–6.) BNSF asks the Court for a declaratory judgment that CNR is obligated to pay BNSF's defense costs under the Interchange Agreement and that CNR breached this obligation by refusing to pay such costs. (*Id.* at 4–5.) BNSF further alleges that if Plaintiffs obtain a judgment against BNSF, CNR is obligated to indemnify BNSF or provide contribution toward the judgment. (*Id.* at 5–6.) Given that BNSF alleges contract claims, the Court will only analyze whether CNR purposefully availed itself of the privilege of conducting activities in Washington.

A defendant purposefully avails itself of the privilege of doing business in the forum state where there is some evidence that it took action in the forum, such as signing or executing a contract. *Schwarzenegger*, 374 F.3d at 802.[5] The United States Supreme Court has found that a

---

[4] Although Plaintiffs bring statutory tort claims against BNSF, those claims are not relevant to assessing whether there is personal jurisdiction over CNR based on BNSF's third-party claims. The Court is also not persuaded by BNSF's assertion that its contribution claim should be treated as a tort claim in resolving the jurisdiction issue. (Dkt. No. 48 at 11.)

[5] This requirement appears to parallel the requirement under Washington law, cited by BNSF, that "the nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state." (Dkt. No. 48 at 5) (citing *SeaHAVN, Ltd. v. Glitnir Bank*, 226 P.3d 141, 149 (Wash. Ct. App. 2010).

defendant purposefully avails itself of the privilege of doing business in a forum where it "deliberately has engaged in significant activities within a State . . . or has created continuing obligations between [itself] and residents of the forum." *Rudzewicz*, 471 U.S. at 476 (internal citations and quotation marks omitted). The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Id*. at 475 (citation omitted).

There is no evidence that CNR has taken *any* actions inside Washington, much less that it "purposefully avail[ed] itself of the privilege of conducting activities within [Washington]." *Id*. CNR is a Canadian corporation whose principal place of business is in Canada. (Dkt. No. 44 at 2.) CNR is not licensed or registered to do business in Washington, does not maintain an agent for service of process in the state, nor does it file tax returns there. (*Id*.) CNR does not own any railroad tracks or land in Washington and none of its employees are based in the state. (*Id*.) While CNR has U.S. subsidiaries, none of them are Washington corporations or have their principal place of business in Washington. (*Id*.) Nor do any of CNR's U.S. subsidiaries own land, own tracks, or employ workers in Washington. (*Id*.)

The Interchange Agreement deals with the parties' activities in Canada, not Washington and its connection to Washington is attenuated. There is no evidence that suggests the Interchange Agreement was negotiated, signed, or intended to be enforced in Washington. (*See generally* Dkt. No. 50-2.) Indeed, the Interchange Agreement specifies that it is to be governed according to the laws of British Columbia and Canada. (*Id*. at 10.) It is difficult for the Court to see how the Interchange Agreement—which regulates the parties' conduct in Canada under Canadian law—creates a "substantial connection" to Washington or creates "continuing obligations" with the state, such that CNR's activities are "shielded by the 'benefits and protections' of [Washington's] laws." *Rudzewicz*, 471 U.S. at 475–76 (citation omitted).

BNSF asserts that CNR has "an ongoing relationship with BNSF that contemplates and requires BNSF to use its Washington employees and equipment to transport goods and materials

from Washington to Canada, and requires BNSF trains go from Washington to Canada and back to ship goods on a daily basis." (Dkt. No. 48 at 6.) BNSF offers the declaration of a contracting officer who gives a detailed description of BNSF and CNR's interchange operations at Thornton Yard. (Dkt. No. 49 at 2–3.) The parties' interchange operations are supposedly based on several agreements, whereby the parties will transfer and then transport each other's freight across Canada and the United States. (*Id*.) According to the declaration, "approximately two BNSF interchange trains a day come from or via the BNSF rail network in Washington and cross in Canada at or near Blaine, Washington to the designated interchange point on CN's track in Canada for furtherance beyond to their final destination in Canada." (*Id*. at 3.)

BNSF's theory of personal jurisdiction is unavailing for at least three reasons. First, the only "activities" that BNSF alleges took place in Washington for the purpose of establishing jurisdiction are not CNR's, but BNSF's. BNSF cannot point to a single action that CNR took in Washington that relates to its third-party claims, other than that the BNSF train that derailed on CNR's railways passed through Washington on its way to Thornton Yard. But BNSF cannot simply rely on the contacts it or Plaintiffs have with Washington to establish specific jurisdiction over CNR. *See Walden v. Fiore*, 571 U.S. 277, 284 (2014) ("We have consistently rejected attempts to satisfy the defendant-focused 'minimum contacts' inquiry by demonstrating contacts between the plaintiff (or third parties) and the forum State.").

Second, the Interchange Agreement does not pertain to the expansive "business relationship" that BNSF alleges it has with CNR. The Interchange Agreement deals with BNSF's use of CNR's railways at and around Thornton Yard, and does not regulate BNSF's operations in Washington or anywhere outside British Columbia. (*See* Dkt. No. 50-2.) Although BNSF trains travel through Washington to reach Thornton Yard in Canada, BNSF does not allege that its trains only travel from Washington to Canada and back. The Interchange Agreement relates to BNSF's use of CNR's tracks in Canada regardless of where the BNSF trains come from or depart to. Moreover, the record demonstrates that in conducting its interchange operations at

Thornton Yard, BNSF handles shipments from across the U.S. and Canada, not simply Washington. (*See* Dkt. No. 48.) The Interchange Agreement's connection to Washington is exactly the type of "attenuated" contact that is insufficient to support personal jurisdiction. *See Rudzewicz*, 471 U.S. at 475–76.

Third, the cases that BNSF asserts support its jurisdictional theory actually suggest the opposite under these facts. BNSF cites to a line of Washington cases that have found specific jurisdiction where an out-of-state company forms an "ongoing business relationship" with a Washington company. (Dkt. No. 48 at 7) (citing *Precision Lab. Plastics, Inc. v. Micro Test, Inc.*, 981 P.2d 454, 457 (Wash. Ct. App. 1999)). In *Precision Lab*, the Washington Court of Appeals found specific jurisdiction where an out-of-state medical company contracted with a Washington plastics manufacturer to specially fabricate a 15 ml vial, which the medical company agreed to buy three million of over a three-year period. *Id*. at 455. The Court of Appeals concluded that the out-of-state company "purposefully and continuously transacted business within Washington State," by entering into a contract that contemplated "future consequences and . . . a continuing relationship with ongoing obligations." *Id*. at 457.

The facts of this case are wholly distinguishable from *Precision Lab*. The ongoing business relationship that BNSF and CNR formed when they entered the Interchange Agreement dealt with BNSF's operations in Canada, not Washington. It is unclear to the Court what "continuing obligations" CNR established with Washington by entering into the Interchange Agreement, whereas the bilateral contract in *Precision Lab* required the plastics manufacturer to perform its end of the bargain in Washington. And unlike the plastics manufacturer in *Precision Lab*, BNSF is not a Washington-based company—it is a national railway carrier, incorporated in Delaware and with its principal place of business in Texas. The other cases BNSF cites in support of specific jurisdiction are similarly inapplicable. (*See* Dkt. No. 48 at 8–10.)

        2.    <u>Litigation Arising from Forum Contacts</u>

Nor do BNSF's third-party claims arise out of or relate to CNR's contacts with

Washington. The Ninth Circuit applies a "but for" test to determine whether claims against an out-of-state defendant arise from its forum contacts. *Shute v. Carnival Cruise Lines*, 897 F.2d 377, 385–86 (9th Cir. 1990). Under this test, a plaintiff's injuries arise out of the defendant's minimum contacts with the forum if the plaintiff would not have been injured "but for" the defendant's minimum contacts with the forum state. *Id.*

Here, CNR's contacts with Washington were not the but-for cause of BNSF's injuries. As the Court has already explained, CNR's only contact with Washington is that some of BNSF's trains pass through the state on the way to Thornton Yard. *See supra* Part II.B.1. Moreover, the Interchange Agreement—and its indemnification provisions that support BNSF's third-party complaint—deals with BNSF's conduct in Canada and is governed by Canadian law. (Dkt. No. 50-2.) The scope and terms of the Interchange Agreement do not support BNSF's assertion that "[t]hese claims would not have occurred but for the fact that CN[R] maintained an ongoing business relationship with BNSF *that required BNSF* to use its Washington employees to transport goods from Washington to [CNR] in Canada and back." (Dkt. No. 48 at 11) (emphasis added). The Interchange Agreement requires no such thing.

Nor can the derailment itself be considered the "but-for" cause of BNSF's injuries because that accident occurred in Canada, not Washington. And as the Court has already detailed, CNR does not have any other business contacts with Washington. *See supra* Part II.B.1. As with the purposeful availment prong, BNSF cites to Washington case law that does not support a finding of jurisdiction. *See Raymond v. Robinson*, 15 P.3d 697, 703 (Wash. Ct. App. 2001) ("This court applies the 'but for' test to determine whether a claim against a nonresident business arises from, or is connected with, *its solicitation of business within the state.*") (emphasis added). CNR has not conducted the type of activities inside of Washington that would make it appropriate for the Court to exercise personal jurisdiction.

Having concluded that CNR neither purposefully availed itself of the benefits of conducting business in Washington nor that BNSF's third-party claims arise from CNR's

contacts with Washington, the Court need not decide whether the exercise of jurisdiction would be reasonable. *See CollegeSource, Inc.*, 653 F.3d at 1076. BNSF has failed to meets it burden of showing a prima facie case of specific jurisdiction.

## III. CONCLUSION

For the foregoing reasons, Defendant Canadian National Railway Company's motion to dismiss (Dkt. No. 43) is GRANTED. Defendant BNSF Railway Company's third-party complaint against Defendant Canadian National Railway Company is DISMISSED without prejudice for lack of personal jurisdiction.

DATED this 20th day of December 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE