THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARVIN DYKES and MARK HARRIS, | CASE NO. C17-01549 |
| Plaintiffs, | ORDER |
| v. | |
| BNSF RAILWAY COMPANY, | |
| Defendant/Third-Party Plaintiff, | |
| CANADIAN NATIONAL RAILWAY COMPANY, | |
| Third-Party Defendant. | |

This matter comes before the Court on Defendant BNSF Railway Company's ("BNSF") motion for summary judgment (Dkt. No. 46). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES the motion for the reasons explained herein.

I.  **BACKGROUND**

The following facts are undisputed for the purpose of this motion. In the early morning of May 14, 2017, Plaintiffs Marvin Dykes and Mark Harris (collectively, "Plaintiffs") were working as the conductor and locomotive engineer aboard a BNSF train when it derailed near

Surrey, British Columbia. (Dkt. No. 47-1 at 3, 14.) Plaintiffs had boarded the train the night before in Everett, Washington and were headed for the Thornton Railyard in British Columbia. (*Id.* at 3, 11.) Thornton Yard is owned by Third-Party Defendant Canadian National Railway Company ("CNR"). (Dkt. No. 47-3 at 8.) BNSF trains go to Thornton Yard to interchange loaded and empty freight cars with CNR. (*Id.*)

To access Thornton Yard, BNSF trains must exit their main line and use a side track known as the Brownsville lead. (Dkt. No. 47-2 at 35.) The Brownsville lead is a 2.5-mile stretch of track that is owned by CNR, and used by BNSF pursuant to an Interchange Agreement with Running Rights ("Interchange Agreement"). (Dkt. Nos. 47-2 at 35, 47-3.) The Interchange Agreement allows BNSF to use both the Brownsville lead and Thornton Yard so that it can conduct its interchange operations, while making CNR responsible for managing, maintaining, and repairing the tracks. (Dkt. No. 47-3 at 10.)

Shortly after switching onto the Brownsville lead, but before reaching Thornton Yard, Plaintiffs' train derailed. (Dkt. No. 47-2 at 34–35.) The train derailed because of a broken rail on the Brownsville lead. (Dkt. Nos. 47-1 at 25, 52-2 at 5.) Both BNSF and CNR state that they were unaware of the broken rail prior to the accident. (Dkt. Nos. 47-1 at 24, 47-2 at 36.) Plaintiffs allege that they suffered severe injuries as a result of the derailment. (Dkt. No. 47-3 at 24.)

Plaintiffs filed this lawsuit against BNSF for negligence under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51.[1] (Dkt. No. 1-2.) BNSF subsequently filed a third-party complaint against CNR for indemnity and contribution under the Interchange Agreement's terms.[2] (*See* Dkt. No. 39.) BNSF now moves for summary judgment on Plaintiffs' claims. (Dkt.

---

[1] Plaintiffs originally filed separate lawsuits that the Court consolidated into this action. (Dkt. No. 9) (ordering *Harris v. BNSF*, C18-0052-JCC, consolidated into this matter). For administrative purposes, the Court ORDERS Plaintiffs to file a copy of the complaint filed in Mr. Harris' lawsuit within seven (7) days of this order.

[2] CNR has filed a motion to dismiss the third-party complaint for lack of personal jurisdiction. (Dkt. No. 43.) The Court will resolve that motion in a separate order.

No. 46.)

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49. Ultimately, summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

### B. BNSF's Motion for Summary Judgment

BNSF asks the Court to grant summary judgment for two reasons. First, BNSF asserts that it cannot be held liable under FELA because Plaintiffs have not produced evidence that BNSF was directly negligent in causing the train derailment that resulted in their injuries. (Dkt. No. 46 at 5.) Second, BNSF asserts that it cannot be held liable for CNR's negligence, if any, because CNR was not acting as BNSF's agent within the meaning of FELA. (*Id*.) In response, Plaintiffs argue that BNSF can be held liable under FELA for the failure to properly inspect, maintain, and repair the broken rail that caused the derailment. (Dkt. No. 51 at 15.)

#### 1. <u>FELA Legal Standard</u>

Under FELA, "[e]very common carrier by railroad . . . shall be liable in damages to any

ORDER
C17-01549
PAGE - 3

person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. The United States Supreme Court has liberally construed FELA to effectuate its remedial purposes. *Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 543 (1994). As a result, FELA cases require plaintiffs to produce less proof than would be necessary for a common law negligence claim. *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 506 (1957) ("Under [FELA] the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought."); *Pierce v. S. Pac. Transp. Co.*, 823 F.2d 1366, 1370 (9th Cir. 1987) (FELA's "relaxed evidentiary standard applies to both negligence and causation determinations.").

Under FELA, railroads owe their employees a nondelegable duty to use reasonable care in furnishing them with a safe place to work. *Shenker v. Baltimore & O. R. Co.*, 374 U.S. 1, 7 (1963); *Ragsdell v. S. Pac. Transp. Co.*, 688 F.2d 1281, 1283 (9th Cir. 1982). This continuing duty "extends beyond [a railroad's] premises and to property which third persons have a primary obligation to maintain." *Carter v. Union R. Co.*, 438 F.2d 208, 211 (3d Cir. 1971) (collecting cases). Federal courts have applied this nondelegable duty broadly, requiring railroads to "inspect the third party's property for hazards and to take precautions to protect [their] employee[s] from possible defects." *Id.* (holding that railroad had a duty to inspect a third-party's property because its employees used the property to park their cars before work); *see also Shenker*, 374 U.S. at 7 (holding that railroad had duty to inspect and make safe railcars owned by third-party because the railroad's employees unloaded the railcars); *Nivens v. St. Louis Sw. Ry. Co.*, 425 F.2d 114, 120 (5th Cir. 1970) (holding that railroad had duty to inspect and discover defects on tracks it leased from a third-party); *Cazad v. Chesapeake & O. Ry. Co.*, 622 F.2d 72, 75 (4th Cir. 1980) (holding that railroad had a duty to inspect the property of a third party for dangerous conditions because it sent its employee onto the property to work).

In addition to broadly construing the railroads' nondelegable duty to provide a safe work place, the Supreme Court has given an "accommodating scope" to the concept of agency liability under FELA. *Sinkler v. Missouri Pac. R. Co.*, 356 U.S. 326, 331 (1958). A railroad's agent, for the purposes of FELA, is one who performs operational activities for the railroad under contract. *Id*. In *Sinkler*, the Court held that "when a railroad employee's injury is caused in whole or in part by the fault of others performing, under contract, operational activities of his employer, such others are agents of the employer within the meaning of s 1 of FELA." *Id*. at 331–32 (internal quotation marks omitted). Following *Sinkler*, federal courts have found various situations in which railroads are held liable for a third party's negligence based on an agency theory. *See*, *e.g*, *Carter*, 438 F.2d at 211 (third party acted as railroad's agent by providing railroad's employees with a parking lot through an informal agreement); *Nivens*, 425 F.2d 114, 120 (third party's negligent design of railway imputed to railroad who leased tracks on which accident occurred); *Payne v. Baltimore & O. R. Co.*, 309 F.2d 546, 549 (6th Cir. 1962) ("If defendant does delegate and relies upon the services of its agent to carry out its own duty, it may not shift its liability from itself to said agent when an employee seeks to hold it directly liable.").

### 2. BNSF's FELA Liability

With the above legal principles in mind, the Court finds that Plaintiffs have presented sufficient evidence at the summary judgment stage to proceed to trial on two theories of FELA liability—first, that BNSF was negligent in breaching its nondelegable duty to inspect and make safe the tracks on which the derailment occurred, and second that CNR's alleged negligence can be imputed to BNSF because the former was acting as the latter's agent pursuant to the Interchange Agreement.

It is undisputed that the derailment in this case was caused by a broken rail on the Brownsville lead. (Dkt. Nos. 47-2 at 38, 52-3 at 7, 52-4 at 4.) Plaintiffs have produced evidence that, when viewed in the light most favorable to them, demonstrates that the broken rail could have been detected through an inspection prior to the derailment.

Photographs of the broken rail section taken shortly after the derailment show multiple surface defects, such as wearing, discoloration, and shelling. (Dkt. No. 52-3 at 9, 52-4 at 15.) The photographs also indicate that there were various track conditions, such as defective crossties and missing and loose fasteners, at the location of the broken rail. (Dkt. Nos. 52-3 at 10, 52-4 at 15.) BNSF's own investigative report into the derailment showed that the broken rail had a "detail fracture" that originated at or near the surface of the rail head, that had progressed through "approximately 70% of the head width," and that was visible in pictures taken after the derailment. (Dkt. No. 52-4 at 13–17.) That report also noted that the "crosstie closest to the rail fracture was degraded before the final fracture, allowing the rail to flex excessively, leading to the final rail failure."[3] (*Id.* at 18.)

In his report, Plaintiffs' industry expert notes that an ultrasonic testing report conducted by CNR 15 months prior to the derailment showed rail defects marked in the location of the broken rail. (Dkt. No. 52-3 at 10.) The report also notes that CNR had inspected the Brownsville lead five days prior to the derailment, but had provided no work reports showing that the previously identified rail defects had been repaired. (*Id.*) Plaintiffs' expert opined that CNR failed to "use reasonable and customary care, skill and diligence in the construction, operation, maintenance, repair and renewal," of the tracks where the derailment occurred. (*Id.* at 22.) The expert concluded that BNSF had failed to comply with several of its own rules and instructions for inspecting and preventing defective rail conditions. (*Id.* at 22–23.)

    *a.    BNSF's Negligence*

Under FELA, BNSF had a non-delegable duty to ensure that the Brownsville lead was a safe place for Plaintiffs to work. *See Shenker*, 374 U.S. at 7. That included the duty to inspect the

---

[3] Although CNR indicated in a closeout report of the derailment that it would "[r]eview RFD tapes to determine if defect was missed on last test," and that "[r]ail section will be sent to lab for further analysis," CNR neither sent the rail for further analysis, nor preserved the broken rail as evidence. (Dkt. Nos. 47-2 at 57, 52-4 at 16.) BNSF asserts that it does not know where the broken rail is, and Plaintiffs indicate that they will seek an adverse inference instruction at trial. (*See* Dkt. Nos. 51 at 3, 52-2 at 5.)

tracks to ensure that they were free of hazardous conditions or defects. *See Carter*, 438 F.2d at 211. It is undisputed that BNSF did not inspect the Brownsville lead prior to the derailment, but instead relied on CNR, under the terms of the Interchange Agreement, to inspect and maintain the tracks. (*See* Dkt. Nos. 46 at 7, 47-3 at 10.) But BNSF cannot, as a matter of law, insulate itself from FELA liability by delegating its duty to ensure a safe workplace to CNR. *See Nivens*, 425 F.2d at 120 (holding that a third-party's failure to maintain tracks in accordance with its lease with a railroad would not defeat plaintiff's FELA claim against railroad resulting from unsafe tracks).

BNSF's arguments to the contrary are unavailing. First, BNSF argues that Plaintiffs have not put forth any evidence showing that it was negligent because none of the parties can "say with certainty when, why, or how the rail broke." (Dkt. No. 46 at 6.) How the rail broke raises a separate question about whether an inspection conducted prior to the derailment would have led to discovery and repair of the broken rail. As described above, Plaintiffs have put forth sufficient evidence to allow a reasonable jury to find that neither BNSF nor CNR exercised reasonable care in inspecting the Brownsville lead prior to the derailment.

BNSF also asserts that there is no evidence that it should have known about a defect or break in the rail prior to the derailment. (*Id*. at 7.) However, since a jury could conclude from the evidence that CNR should have been on notice of the broken rail, then BNSF could similarly be found to have constructive notice of the defect. *See Security Ins. Co. v. Johnson*, 276 F.2d 182 (10th Cir. 1960) (holding that constructive notice is sufficient to prove negligence in FELA case). Moreover, BNSF cannot absolve itself from FELA liability by arguing that it could not have discovered the broken rail because CNR was exclusively responsible for maintaining the Brownsville lead. The Supreme Court rejected that exact argument in a case where it held that a railroad was liable for its employee's injuries caused by a third-party's defective railcar despite the fact that it would have been essentially impossible for the railroad to discover the relevant defect. *Shenker*, 374 U.S. at 10. The Court held that the railroad's lack of control or supervision

over the defective railcar did not provide "an exception to the employer's duty to provide a safe place to work," and that the railroad could have protected itself "by refusing to permit its employees to service the car." *Id*.

The Court again emphasizes that the degree of proof necessary to take a FELA claim to a jury is significantly less than a normal negligence claim. *See Pierce*, 823 F.2d at 1370 ("A jury's right to pass upon the questions of fault and causation in FELA actions must be viewed liberally; the jury's power to engage in inferences is significantly broader than in common law negligence actions."). Whether BNSF exercised reasonable care in ensuring that the Brownsville lead was safe, such that it met its non-delegable duty to provide Plaintiffs with a safe workplace, is a question for the jury.[4]

       *b.*       *Agency Theory*

Plaintiffs can separately argue at trial that CNR's negligence in failing to adequately inspect and repair the Brownsville lead can be imputed to BNSF because CNR was acting as its agent. BNSF and CNR entered into the Interchange Agreement because "it was desirable and beneficial for each of the parties [] to deliver and receive interchange traffic" in the Thornton Yard. (Dkt. No. 47-3 at 8.) As part of the Interchange Agreement, CNR allowed BNSF to operate its trains along the Brownsville lead in order to access Thornton Yard, "for the sole purpose of delivery and receipt of interchange traffic." (*Id*. at 9.) The Interchange Agreement also placed "[t]he construction, maintenance, repair and renewal of the [Brownsville lead]" under the exclusive direction and control of CNR. (*Id*. at 10.)

The Court concludes that by allowing BNSF to use the Brownsville lead pursuant to the Interchange Agreement, CNR was performing operational activities for BNSF such that it was the railroad's agent under FELA. CNR not only allowed BNSF to use the Brownsville lead, but also performed inspections and maintenance of the tracks where the derailment occurred. (*See*

---

[4] The Court's ruling on summary judgment does not preclude BNSF from raising this issue again during trial.

Dkt. No. 47-3 at 10.) Such operational tasks go to the very core of BNSF's business—indeed, BNSF would not have been able to conduct its interchange operations in British Columbia without the use of the Brownsville lead. (Dkt. No. 46 at 4, 47-3 at 1.) By entering into the Interchange Agreement, BNSF effectively outsourced these essential operational tasks to CNR, which it would otherwise have had to perform itself. Therefore, if CNR acted negligently in inspecting or maintaining the tracks where the derailment occurred, its negligence can be imputed to BNSF.[5] This strikes the Court as the exact type of scenario where courts have found an agency relationship under FELA. *See Sinkler*, 356 U.S. at 331 (finding that third-party switching operator was an agent because it played a part in railroad's "total enterprise"); *Nivens*, 425 F.2d at 120 (upholding trial court's agency instruction, which stated that railroad would be liable for third-party's negligent design of railway because the tracks were used "for [the railroad's] benefit and in furtherance of its operational activities") (internal quotation marks omitted); *Carter*, 438 F.2d at 211 (holding that an agency relationship existed when a third party provided railroad employees with a parking lot to use before and after work).

BNSF argues that CNR could not have been its agent based on the United States Supreme Court's decision in *Ward v. Atl. Coast Line R. Co.*, 362 U.S. 396 (1960). The plaintiff in *Ward* was a railroad worker, who was injured while performing maintenance on a siding track that was connected to the defendant railroad's main line but that was owned and used by a turpentine company. 362 U.S. at 396–97. The turpentine company hired and paid the plaintiff to perform the maintenance on its tracks during his day off from working at the railroad company. *Id*. After being injured, the plaintiff sued the railroad company under FELA, arguing that in maintaining the siding track, the turpentine company acted as the railroad's agent. *Id*.

The Supreme Court rejected the plaintiff's agency theory, holding that the turpentine company was not the railroad's agent because in maintaining the siding track the plaintiff was

---

[5] As the Court has detailed above, Plaintiffs have made a sufficient showing at summary judgment of CNR's negligence. *See supra* Part II.B.2.

not "engaged in furthering the operational activities [of the railroad]." *Id*. The Supreme Court emphasized that the railroad did not own the siding track, did not direct the plaintiff to maintain the track, and that the track was maintained for the sole benefit of the turpentine company. *Id*. at 398. The Supreme Court concluded that the case did not present "a situation, as in *Sinkler*, in which the railroad engaged an independent contractor to perform operational activities to carry out the franchise." *Id.*

The facts in *Ward* bear little resemblance to the present case. Plaintiffs were working for BNSF, not CNR, when the derailment occurred on the Brownsville lead. BNSF entered into the Interchange Agreement with CNR so that it could use the Brownsville lead and Thornton Yard to conduct its operations in British Columbia. The Interchange Agreement also relieved BNSF from having to inspect, maintain, and repair the tracks that it used to conduct its operations. The operative facts in *Ward* were that the defendant railroad neither ordered its employee to maintain the turpentine company's siding track nor stood to benefit from the track's repair. This case presents the opposite situation—Plaintiffs were operating their train on the Brownsville lead at the direction of BNSF and for the railroad's clear benefit. BNSF's narrow reading of *Ward* is at odds with Congress's intent that FELA be liberally applied.[6] *See Sinkler*, 356 U.S. at 330–31 ("Plainly an accommodating scope must be given to the word 'agents' to give vitality to the standard governing the liability of carriers to their workers injured on the job.")

---

[6] Nor is the Court persuaded by BNSF's policy argument that if it could be held liable for CNR's negligence, then it could potentially be held liable whenever and wherever one of its employees is injured as a result of a third party's negligence. (Dkt. No. 54 at 4–5.) First, FELA imposes broad liability on railroads that is "an avowed departure from the rules of the common law," and which obligates railroads "to bear the burden of all injuries befalling those engaged in the enterprise arising out of the fault of any other member engaged in the common endeavor." *Sinkler*, 356 U.S. at 330. This case does not involve some attenuated instance of third-party negligence—it involves a *train derailment* allegedly caused by insufficient inspection and maintenance of *railways*. Second, the Court cannot help but observe that the Interchange Agreement's indemnification provisions appear to be an attempt to protect BNSF from the exact type of broad liability which it argues FELA does not impose. (Dkt. No. 47-3 at 14.) Indeed, BNSF has filed a third-party complaint against CNR for that very reason. (Dkt. No. 39.)

ORDER
C17-01549
PAGE - 10

### III. CONCLUSION

For the foregoing reasons, Defendant BNSF's motion for summary judgment (Dkt. No. 46) is DENIED.

DATED this 20th day of December 2018.

John C. Coughenour
UNITED STATES DISTRICT JUDGE