THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARVIN DYKES and MARK HARRIS, <br><br> Plaintiffs, <br> v. <br><br> BNSF RAILWAY COMPANY, <br><br> Defendant. | CASE NO. C17-1549-JCC <br><br> ORDER |

This matter comes before the Court on Plaintiffs'[1] motion for partial summary judgment (Dkt. No. 80) and motion for sanctions for spoliation of evidence (Dkt. No. 82). Having thoroughly considered the parties' briefing and the relevant record, the Court finds oral argument unnecessary and hereby DENIES the motion for partial summary judgment and GRANTS in part and DENIES in part the motion for sanctions for spoliation of evidence for the reasons explained herein.

I. **BACKGROUND**

The Court has detailed the facts of this case in a prior order, which it will cite to as relevant to the present motions. (*See* Dkt. No. 77.) On May 14, 2017, Plaintiffs were working as

---

[1] On March 7, 2019, the Court received telephonic notice that Plaintiff Mark Harris had settled his claims against Defendant. As Plaintiffs have not filed a notice of settlement regarding the disposition of Mr. Harris' claim, the Court writes this order as if he is still part of the lawsuit.

the conductor and locomotive engineer aboard a train owned by Defendant BNSF Railways ("BNSF") that derailed near Surrey, British Columbia. (*Id*. at 1–2.) The train derailed on a section of railway known as the "Brownsville Lead" that is owned by Canadian National Railway Company ("CNR").[2] (*Id*. at 2.) BNSF operated its trains on the Brownsville Lead pursuant to an Interchange Agreement with Running Rights (the "Interchange Agreement") with CNR. (*Id.*) The Interchange Agreement allowed BNSF to use the Brownsville Lead to conduct interchange operations at CNR's Thornton Yard. (*Id.*) The Interchange Agreement makes CNR exclusively responsible for managing, maintaining, and repairing the Brownsville Lead. (*Id.*)

The parties do not dispute that the train derailed because of a broken rail on the Brownsville Lead. (*Id.*) Days after the derailment, BNSF sent CNR an email asking it to "capture, retain and provide (if requested) the evidence secured during the course of [CNR's] investigation . . . ." (Dkt. No. 88-1 at 2.) Despite this request, CNR did not preserve the broken rail and does not know where it is. (Dkt. No. 83-1 at 10, 83-3 at 19.) As a result, the broken rail did not undergo testing to determine the cause of the break. (Dkt. Nos. 52-4 at 16, 83-3 at 18.)

Plaintiffs filed this lawsuit against BNSF for negligence under the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51.[3] (Dkt. No. 1-2.) Plaintiffs allege that BNSF breached its duty to provide them with a reasonably safe workplace by failing to inspect and repair the broken rail that caused the derailment. (*Id*. at 3; Dkt. No. 78 at 3.) BNSF moved for summary judgment on Plaintiffs' claims, arguing that there was no evidence that it was directly negligent in failing to discover the broken rail, and that it could not be held liable for CNR's negligence, if any, because CNR was not its agent. (Dkt. No. 46.)

The Court denied BNSF's motion for summary judgment on both grounds. (Dkt. No. 77.)

---

[2] BNSF filed a third-party claim against CNR for indemnification pursuant to the parties' Interchange Agreement; however, the Court dismissed CNR for lack of personal jurisdiction. (*See* Dkt. No. 76.)

[3] Because this incident occurred in Canada, FELA's provisions apply through Washington law. *See* Wash. Rev. Code 51.12.080.

First, the Court ruled that Plaintiffs had produced sufficient evidence for a jury to determine that BNSF had breached its nondelegable duty to provide them with a safe workplace. (*Id*. at 8.) Second, the Court held that CNR was acting as BNSF's agent for the purposes of FELA liability. (*Id*. at 10.) The Court reasoned that CNR was performing several "operational tasks" for BNSF pursuant to the Interchange Agreement, such as the provision, inspection, and repair of the railways BNSF used to conduct business in British Columbia. (*Id*.) Therefore, CNR's negligence, if any, in failing to inspect, maintain, and repair the broken rail can be imputed to BNSF under FELA. (*Id*.)

Plaintiffs now move for partial summary judgment asking the Court to find that BNSF was negligent as a matter of law, while reserving the issues of causation and damages for trial. (Dkt. Nos. 80 at 1, 92 at 1.) Plaintiffs also move the Court to sanction BNSF for CNR's failure to preserve the broken rail. (Dkt. No. 82 at 2.) Plaintiffs argue that the Court should either enter partial summary judgment against BNSF or provide the jury with an adverse inference instruction regarding CNR's failure to preserve the rail. (*Id.* at 10–11.) BNSF objects to both motions. (Dkt. Nos. 85, 87.)

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In making such a determination, the Court must view the facts and justifiable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986). Once a motion for summary judgment is properly made and supported, the opposing party "must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence

for a reasonable jury to return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248–49.)

### B. Plaintiffs' Motion for Partial Summary Judgment

#### 1. FELA Legal Standard

Under FELA, "[e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier." 45 U.S.C. § 51. A FELA plaintiff bears the burden of proving the existence of a duty owed by the defendant, a breach of that duty, causation, and damages. *See Consol. Rail Corp. v. Gottshall*, 512 U.S. 532, 538 (1994).

Under FELA, railroads owe their employees a nondelegable duty to use reasonable care in furnishing them with a safe place to work. *Shenker v. Baltimore & O. R. Co.*, 374 U.S. 1, 7 (1963). "[The] continuous duty to provide a safe place to work is broader than the general duty to use reasonable care." *Ragsdell v. S. Pac. Transp. Co.*, 688 F.2d 1281, 1283 (9th Cir. 1982). The duty applies even when a railroad's employees are working on a third party's property over which the railroad has no control. *Bodey v. Burlington N. R. Co.*, 62 F.3d 1423 (9th Cir. 1995) (citing *Shenker*, 374 U.S. at 8).

"An employer breaches its duty to provide a safe workplace when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees." *Gallose v. Long Island R. Co.*, 878 F.2d 80, 84–85 (2d Cir. 1989). Federal courts have held that the duty requires railroads to "inspect the third party's property for hazards and to take precautions to protect [their] employee[s] from possible defects." *Carter v. Union R. Co.*, 438 F.2d 208, 211 (3d Cir. 1971) (collecting cases); *see also Tappero v. S. Pac. Transp. Co.*, 859 F.2d 154 (9th Cir. 1988) (finding that defendant railroad negligently failed to furnish its employees a reasonably safe place to work by failing to exercise due care in its inspection of the rail.).

## 2. CNR's Negligence

Plaintiffs' primary argument on summary judgment is that CNR's negligence in inspecting, maintaining, and repairing the Brownsville Lead's rails should be imputed to BNSF through the Court's prior agency ruling. (See Dkt. No. 92 at 2.) As BNSF's agent under FELA, CNR had a duty to exercise reasonable care to inspect and repair hazardous conditions on its railways. *See* 45 U.S.C. § 51; *Ragsdell*, 688 F.2d at 1283.

Plaintiffs offer significant evidence that CNR failed to exercise reasonable care in inspecting and repairing the section of rail on the Brownsville Lead where the train derailed. Pictures from the derailment site show visible surface defects on the rails, including shelling and discoloration. (Dkt. No. 81-4 at 8.) In February 2017, CNR conducted a heavy geometry car inspection of the Brownsville Lead and found various defects in the track where the derailment occurred. (Dkt. No. 81-3 at 15.) That section of track displayed both cross level and wide gauge defects, which CNR characterized as "near urgent" and "scheduled for repair" in its inspection report.[4] (*Id*. at 16–17, 42.) Neither CNR nor BNSF have provided records showing that repairs were made to the subject rail prior to the derailment. (*Id*. at 17.)

On April 21, 2017, CNR conducted ultrasonic testing on the Brownsville Lead and discovered defects in the area of the derailment. (Dkt. No. 86-1 at 4.) However, Plaintiffs' expert witness was not able to say whether those defects caused the broken rail or played a role in the derailment. (Dkt. No. 81-5 at 13.) Both Plaintiffs' and BNSF's expert witnesses noted that the broken rail had a "detail fracture" that originated at or near the surface of the rail head, had progressed through "approximately 70% of the head width," and was visible in pictures taken after the derailment. (Dkt. No. 81-6 at 16.)

The crosstie closest to the broken rail had missing and loose fasteners—a condition

---

[4] A cross level defect describes a situation in which the difference in elevation between the two rails at a given point is outside of an accepted tolerance level. (Dkt. No. 83-1 at 15–16.) A wide gauge defect describes a situation in which the width between the two rails at a given point is outside of an accepted tolerance level. (*Id*.)

which BNSF's expert concluded allowed "the rail to flex excessively, leading to the final rail failure." (*Id*. at 17.) One of BNSF's corporate agents stated in his deposition that he would consider the crosstie defective based on BNSF's standards, but that he did not think it would "limit the operating speed or operation over that particular piece of track." (Dkt. No. 81-2 at 10.) The broken crosstie had a red-paint marking on it, which CNR's Senior Manager of Engineering stated is sometimes used during inspections to signal a defective condition that is scheduled for repair. (Dkt. No. 81-3 at 10–11, 40.)

Based on the above facts, Plaintiffs' expert opined that CNR failed to "use reasonable and customary care, skill and diligence in the construction, operation, maintenance, repair and renewal" of the tracks where the derailment occurred. (*Id.* at 22.) BNSF's expert did not provide an opinion regarding whether CNR acted with reasonable care in inspecting, maintaining, or repairing the broken rail. (Dkt. No. 81-6 at 17–18.) Plaintiffs further argue that they were unable to determine the true cause of the broken rail because BNSF and CNR failed to preserve the rail for testing. (Dkt. No. 80 at 14.) Plaintiffs asserts that this weighs in favor of finding that CNR was negligent as a matter of law.[5] (*Id*.)

BNSF points to the following evidence that suggests that CNR was not negligent in failing to inspect or repair the broken rail, or that there are at least disputed issues of material fact that must be decided at trial. CNR's corporate representative stated in his deposition that CNR's inspections of the Brownsville Lead prior to the derailment did not reveal defects that made the tracks noncompliant with safety standards or unusable. (Dkt. No. 86-1 at 3) ("as per the inspection, the track was safe and compliant for safe operation of trains."). CNR conducted weekly inspections of the Brownsville Lead, and an inspection was conducted five days before the derailment. (*Id*. at 13; Dkt. No. 47-2 at 39.) While CNR could not state when the subject rail broke, it stated that "we know it was on or about [the] time" of the derailment. (Dkt. No. 81-3 at

---

[5] The Court addresses the spoliation issue more fully when discussing Plaintiffs' motion for sanctions. *See* Part II.C.

21.) Although CNR could not produce repair records for the cross level and wide gauge defects identified by the February 2017 heavy car geometry test, it maintained that the most recent inspection of the Brownsville Lead showed that the rails were safe for travel.[6] (Dkt. No. 86-1 at 13.) CNR's corporate representative testified that while these defects were identified as "near urgent," scheduled repairs could take place anywhere from 10 to 100 days after the inspection. (*Id*. at 12.)

CNR hired a third party to review the last ultrasonic test that was conducted on the Brownsville Lead prior to the derailment to determine if there were flaws present at the site of the broken rail. (*Id*. at 4.) The reviewer concluded that there were "no indications" of a defect on the broken rail. (*Id*. at 5.) While there was a marked defect "a few feet away," it was located on the rail opposite the broken rail. (*Id*.)

CNR disputes that the crosstie adjoining the broken rail was sufficiently defective such that it rendered the rail unsafe for travel. (*Id*. at 7–8.) CNR's Senior Manager of Engineering stated that loose bolts on the tie plate next to the broken rail did not represent a defect. (*Id*. at 7) ("That's not a defect, not specifically with the raised bolts. If the track can maintain gauge in the surface in the surface it's still okay."). He also stated that one broken tie plate is not a defect that would need to be repaired, and that that several consecutive tie plates would need to be broken in order for CNR to conduct an immediate repair. (*Id*. at 8) ("As per standards one is not a defect so it's not an urgent priority fix."). He further stated that one degraded crosstie would not represent a defective condition that required immediate repair. (*Id*.) ("One single tie is not a defective condition. If there's multiple in an area, then yes.").

Viewing the above evidence in the light most favorable to BNSF, the Court concludes that there are genuine disputes of material fact regarding whether CNR exercised reasonable care in inspecting and repairing the section of the Brownsville Lead where the derailment occurred.

---

[6] CNR implied in its deposition that the repairs were made. (*See* Dkt. No. 86-1 at 12) ("By looking at this I can't confirm exactly the date it was repaired on.").

There is a genuine dispute about whether CNR adequately inspected the subject rail prior to the derailment—specifically whether CNR's inspections failed to uncover the defects that could have contributed to the broken rail. There is also a genuine dispute regarding whether CNR should have repaired the defective conditions it discovered prior to the derailment. Drawing all inferences in BNSF's favor, a reasonable juror could conclude that CNR's failure to repair defects identified in its prior inspections was not a breach of its duty to exercise reasonable care to ensure the Brownsville Lead was safe for trains to operate.

The Court reiterates that in the FELA context, it is especially important for a jury to decide the question of negligence. *See Pierce v. S. Pac. Transp. Co.*, 823 F.2d 1366, 1370 (9th Cir. 1987) ("A jury's right to pass upon the questions of fault and causation in FELA actions must be viewed liberally; the jury's power to engage in inferences is significantly broader than in common law negligence actions."). Therefore, Plaintiffs' motion for partial summary judgment as to BNSF's negligence based on the conduct of CNR (Dkt. No. 80) is DENIED.[7]

### C. Plaintiffs' Motion for Sanctions

Plaintiffs assert that both BNSF and CNR spoliated evidence by failing to preserve the broken rail in anticipation of this lawsuit. (Dkt. No. 82 at 2.) As a result, Plaintiffs argue that they were unable to determine how the rail broke, and are hamstrung in proving that BNSF and CNR were negligent in failing to detect or prevent the break. (*Id*.) Plaintiffs ask the Court to sanction BNSF and CNR by ruling that they were negligent as a matter of law. (*Id*. at 10.)

District courts possess inherent authority to impose sanctions against a party that prejudices its opponent through the destruction or spoliation of relevant evidence. *See Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993). Spoliation is the "destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence, in

---

[7] The Court reserves for trial the issue of BNSF's direct negligence because that issue will similarly turn on factual issues regarding whether CNR acted negligently in failing to inspect and repair the Brownsville Lead.

pending or future litigation." *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 649 (9th Cir. 2009). A party seeking sanctions for spoliation first bears the burden of establishing that the opposing party destroyed relevant evidence. *Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015). The party alleging spoliation must prove:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a 'culpable state of mind;' and (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 989 (N.D. Cal. 2012) (citing cases). When spoliation has occurred, district courts may impose a variety of sanctions, including:

> (1) exclusion of evidence, (2) admitting evidence of the circumstances of the destruction or spoliation, instructing the jury that it may infer that the lost evidence would have been unfavorable to the party accused of destroying it, or (4) entering judgment against the responsible party, either in the form of dismissal or default judgment.

*Pettit v. Smith*, 45 F. Supp. 3d 1099, 1105 (D. Ariz. 2014).

As an initial matter, it is undisputed that CNR failed to preserve the broken rail at issue in this case. CNR's internal records show that it intended to send the broken rail to a lab "for further analysis," but never did so. (Dkt. No. 83-3 at 8.) CNR's corporate representative testified that he did not know why the rail was not sent to the lab and did not know where the rail was. (*Id*. at 8–9, 13.) CNR has not provided any explanation for why the rail was not preserved or what became of it. (*See id.*)

Not only did CNR fail to preserve the broken rail as evidence, it was undoubtedly on notice that future litigation could arise from the derailment. Two days after the derailment, BNSF wrote an email to CNR to inform it that BNSF was "preserving potentially relevant evidence relating to this incident." (Dkt. No. 88-1 at 2.) BNSF asked CNR to "capture, retain and provide (if requested) the evidence secured during the course of [CNR's] investigation . . . ." (*Id.*) Notwithstanding BNSF's request, CNR would have also been on notice of its obligation to

preserve the broken rail because, under the Interchange Agreement, it could potentially be liable for the property damage and personal injuries that resulted from the derailment. (*See* Dkt. No. 88-2 at 8.) There is also no question that the broken rail would be highly relevant evidence in any future litigation arising from the derailment. *See supra* Part II.B.

Having determined that spoliation occurred, the Court must determine which party should be sanctioned and the appropriate sanction. The undisputed evidence demonstrates that BNSF neither possessed nor exercised control over the broken rail. CNR owns the Brownsville Lead, and pursuant to the Interchange Agreement had exclusive control over the maintenance and repair of the broken rail. (Dkt. Nos. 47-2 at 4, 88-2 at 4.) Representatives of both BNSF and CNR have testified that BNSF personnel did not have access to or control over the rails at the Brownsville Lead, and were limited in the investigation they could conduct into the causes of the broken rail. (Dkt. No. 83-2 at 6–7, 88-5 at 3–4) ("Our inspectors are not typically allowed to measure track on other railways. It's like going into someone's house and digging through the cupboards."). There is no evidence in the record suggesting BNSF had access to the broken rail, aside from when its trainmaster was at the derailment site for a few hours after the accident. (*See* Dkt. No. 83-1 at 7–10.) As the Court previously noted, BNSF requested that CNR preserve all evidence related to the derailment, but CNR simply ignored that request with regard to the broken rail. Therefore, BNSF is not directly responsible for spoliation of the broken rail.

Plaintiffs suggest that BNSF can still be held liable for CNR's spoliation because the latter was acting as the former's agent. (Dkt. No. 82 at 2.) Plaintiffs argue that because of the agency relationship "the failures of CNR to act to preserve the evidence is imputed to BNSF." (*Id*. at 9.) It is not uncommon for courts to hold principals liable for spoliation committed by their agents. *See, e.g.*, *Victor Stanley, Inc. v. Creative Pipe, Inc.*, 269 F.R.D. 497, 515 n.23 (D. Md. 2010) (holding defendant liable for spoliation committed by its attorneys). However, such imputation of liability is based on traditional notions of agency law, in which a defendant principal exercises control and authority over its third-party agent who possesses the spoliated

evidence. *See, e.g.*, *Goodman v. Praxair Servs., Inc.*, 632 F. Supp. 2d 494, 523 n.16 (D. Md. 2009) (defendant employer held liable for employee's spoliation of evidence under agency theory).

In this case, the Court has previously ruled that CNR was acting as BNSF's agent *for purposes of FELA liability*. (*See* Dkt. No. 72 at 8) ("[B]y allowing BNSF to use the Brownsville Lead pursuant to the Interchange Agreement, CNR was performing operational activities for BNSF such that it was the railroad's agent under FELA."). The Court's ruling was based on the "accommodating scope" that Congress intended, and that federal courts have given, to FELA's concept of agency. (*Id.* at 10) (citing *Sinkler v. Missouri Pac. R. Co.*, 356 U.S. 326, 331 (1958)). In contrast to Plaintiffs' position, the Court's agency determination was cabined to the issue of BNSF's FELA liability and does not control BNSF's liability for CNR's spoliation of evidence.

Put simply, CNR is not BNSF's agent under traditional standards of agency law. As relevant to this case, BNSF and CNR's relationship was embodied in the Interchange Agreement. (*See* Dkt. No. 88-2 at 2–12.) The Interchange Agreement allowed BNSF to use the Brownsville Lead to conduct its interchange operations, but did not provide BNSF with any authority or control over how CNR inspected, maintained, or repaired its rails. (*See id.*) The Interchange Agreement certainly did not authorize BNSF to compel CNR to provide it with the broken rail in this case, or for BNSF to retrieve any physical evidence from the Brownsville Lead. (*Id.*) BNSF also correctly points out that it not only lacks authority over CNR, but that the entities are adverse parties in this litigation. (Dkt. No. 87 at 4.) Pursuant to the Interchange Agreement's indemnity provisions, CNR will be potentially liable to BNSF for any judgment that is entered against it in this action. (*See* Dkt. No. 88-2 at 10.) Given their adverse relationship, the Court cannot conclude that CNR is BNSF's agent for the purpose of imposing spoliation sanctions.

The Court does conclude, however, that CNR can, and should, be sanctioned for its spoliation of the broken rail. Courts in the Ninth Circuit have held that a non-party can have a

duty to preserve evidence, when it is not "merely a disinterested third-party." *Pettit*, 45 F. Supp. at 1106 (sanctioning non-party state agency for its spoliation because it controlled the relevant evidence and would potentially be liable for paying a judgment in the case). CNR is not a disinterested third-party in this case—it possessed and controlled a key piece of evidence; was on notice that litigation involving that evidence would likely ensue; and could potentially be liable for indemnifying BNSF. *See supra*. As the Court has explained above, all of the spoliation factors are met regarding CNR's failure to preserve the broken rail. *See Apple*, 888 F. Supp. 2d at 989.

Plaintiffs argue that the appropriate sanction is for the Court to enter judgment against BNSF on the issue of negligence. (Dkt. No. 82 at 10.) The Court finds that this would be an overly harsh sanction, given that BNSF did not have control over the broken rail and attempted to have it preserved. Indeed, the Court's spoliation sanction should be targeted at the responsible party. *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001) (holding that courts must find some degree of fault in imposing sanctions and that "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine.").

The Court finds that an adverse jury instruction regarding CNR's spoliation is an appropriately tailored sanction under the circumstances. District courts possess "broad discretionary power to permit a jury to draw an adverse inference from the destruction or spoliation against the party or witness responsible for that behavior." *Glover*, 6 F.3d at 1329 (citing *Akiona v. United States*, 938 F.2d 158 (9th Cir. 1991)). An adverse inference instruction regarding CNR's conduct will adequately balance the prejudice Plaintiffs have experienced with the fact that BNSF was not responsible for the spoliation. The instruction will allow the jury to presume that CNR's failure to preserve the broken rail is indicative of its negligence.[8] Such an instruction will properly sanction CNR's conduct, while not indicating to the jury that BNSF was

---

[8] The Court will consider proposed adverse inference instructions from both parties.

at fault for failing to preserve a key piece of evidence.

**III.   CONCLUSION**

For the foregoing reasons, Plaintiffs' motion for partial summary judgment (Dkt. No. 80) is DENIED, and motion for spoliation of evidence (Dkt. No. 82) is GRANTED in part and DENIED in part.

DATED this 12th day of March 2019.

John C. Coughenour
UNITED STATES DISTRICT JUDGE